## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. _____ |
| | : | |
| Plaintiff, | : | |
| | : | VIOLATIONS: 18 U.S.C. §§ 371, 1343, |
| | : | and 2 and 15 U.S.C. §§ 78m and 78dd-1 |
| v. | : | (Conspiracy, Wire Fraud, and Foreign |
| | : | Corrupt Practices) |
| INNOSPEC INC., | : | |
| | : | |
| Defendant. | : | |

## INFORMATION

### GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise alleged:

*Relevant Entities and Individuals*

1.       INNOSPEC INC., previously known as Octel Corporation, ("INNOSPEC"), was

a Delaware company with executive offices in the United Kingdom.  INNOSPEC was engaged

in the manufacture and sale of fuel and power-related chemicals such as gasoline additives,

including tetraethyl lead ("TEL").  INNOSPEC issued and maintained a class of publicly-traded

securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 (15 U.S.C.

§ 78l), which were traded on the NASDAQ after March 22, 2006.  Prior to March 22, 2006,

INNOSPEC's securities were traded on the New York Stock Exchange.  As a result, INNOSPEC

was required to file periodic reports with the United States Securities and Exchange Commission

under Section 13 of the Securities Exchange Act (15 U.S.C. § 78m).  Accordingly, INNOSPEC

was an issuer organized under the laws of the United States, within the meaning of the Foreign

Corrupt Practices Act of 1977 ("FCPA"), 15 U.S.C. § 78dd-1(a) and (g).

2.      Innospec Limited, previously known as Associated Octel Company, Ltd.

("Limited"), a wholly-owned subsidiary of INNOSPEC, also manufactured and sold fuel and

power-related chemicals, including TEL.  Limited was headquartered in Ellesmere Port in the

United Kingdom.

3.      Alcor Chemie Vertriebs GmbH ("Alcor"), a wholly-owned subsidiary of

INNOSPEC incorporated in Switzerland, also manufactured and sold TEL.  Alcor was

headquartered in Zug, Switzerland, and maintained a manufacturing plant in the Federal

Republic of Germany until in or around March 2002.

4.      The Iraqi Ministry of Oil (the "MoO") and its component refineries and

directorates were customers of INNOSPEC and Alcor.  The MoO, including all its refineries,

was a department, agency, and instrumentality of the Government of the Republic of Iraq within

the meaning of the FCPA, 15 U.S.C. § 78dd-1(f)(1)(A).

5.      Ousama M. Naaman acted as the agent for INNOSPEC and Alcor in Iraq and

elsewhere beginning in at least 1995 and maintained his principal offices in Abu Dhabi, United

Arab Emirates.  On behalf of INNOSPEC and Alcor, Naaman negotiated contracts with the MoO

to provide TEL to the oil refineries operating in Iraq.

6.      Interact s.a.r.l. and Tawam Commercial Est. were companies controlled by

Naaman, which acted as INNOSPEC's agents in Iraq and were used to facilitate the payment of

kickbacks and bribes to and for the benefit of officials of the MoO and the Government of Iraq.

7.      "Executive A," a British citizen, was the Chief Executive Officer of INNOSPEC and Limited until in or around April 2005.

8.      "Executive B," a United States citizen, was a senior executive of INNOSPEC after in or around December 2002.

9.      "Alcor Manager," a German citizen, was the General Manager of Alcor.

10.     "Director," a British citizen, was a division managing director for INNOSPEC.

11.     "Employee A," a South African citizen, was supply chain director for INNOSPEC.

12.     "Official A," an Iraqi citizen, was a senior official in the MoO.

13.     "Official B," an Iraqi citizen, was a senior official in the MoO.

14.     "Official C," an Iraqi citizen, was a senior official in the MoO.

*The United Nations Oil-for-Food Program*

15.     On or around August 6, 1990, days after Iraq's invasion of Kuwait, the U.N. adopted Security Council Resolution 661, which prohibited U.N. member states from transacting business with Iraq, except for the purchase and sale of humanitarian supplies.  Resolution 661 prohibited virtually all direct financial transactions with the government of Iraq.

16.     On or around April 15, 1995, the U.N. adopted Security Council Resolution 986, which provided a limited exception to the Iraq sanctions regime in that it allowed Iraq to sell its oil.  However, Resolution 986 required that the proceeds of oil sales be used by the Iraqi government to purchase humanitarian supplies for the Iraqi people, including food and equipment to maintain and service Iraq's oil sector.  Hence, this program became known as the

Oil for Food Program. Payments made to the Iraqi government which were not approved by the U.N. and which were outside the strict contours of the OFFP were prohibited.

17.     The rules of the OFFP required that the proceeds from all sales of Iraqi oil be deposited into a U.N.-controlled escrow account at the New York branch of Banque Nationale de Paris ("BNP-Paribas"). That escrow account funded the purchase of humanitarian goods by the Iraqi government.

18.     Under the provisions of the OFFP, a supplier of humanitarian goods contracted with a ministry or other department of the Iraqi government to sell goods to the Iraqi government. Once that contract was finalized, the contract was submitted to a U.N. Committee (the "661 Committee") which reviewed the contracts to ensure that their terms complied with all OFFP and Iraqi sanction regulations. The 661 Committee accepted the contracts, rejected them, or asked the supplier to provide additional information upon which the committee could make a decision.

19.     If a contract was approved by the 661 Committee, a letter of credit was issued by the New York branch of BNP-Paribas to the supplier's bank stating that the supplier would be paid by the OFFP for the relevant goods once certain conditions were met, including delivery of the goods to Iraq and inspection of the goods by a U.N. contractor. Once those conditions were deemed by the U.N. to have been met, the U.N. would direct BNP-Paribas to release payment to the supplier.

20.     On or around December 10, 1996, the first Iraqi oil exports under the OFFP began. The OFFP continued from in or around December 1996 until the United States invasion of Iraq on or around March 19, 2003. From in or around December 1996 through March 2003,

the United States government prohibited United States companies and individuals from engaging in transactions with the government of Iraq, unless such transactions were authorized by the U.N. pursuant to the OFFP. 31 C.F.R. § 575.201, *et seq.*

21.     Beginning in approximately August 2000, the Iraqi government demanded that suppliers of humanitarian goods pay a kickback, usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a contract by the government. These kickbacks violated U.N. OFFP regulations and U.N. sanctions which prohibited payments to the Iraqi government which were not expressly approved by the U.N. and which were not contemplated by OFFP guidelines.

22.     Often, these kickbacks were termed "after sales service fees" ("ASSFs"). They did not, however, involve the performance of any actual service by the supplier. Typically, these ASSFs were included in the contract price submitted by the supplier to the U.N. without disclosing to the U.N. the fact that the contract contained an extra 10% which would be kicked back to the Iraqi government. Including the 10% in the submitted contract price allowed the supplier to avoid paying the 10% out of its profits; instead, the suppliers caused the U.N., unknowingly, to fund the kickbacks to the Iraqi government.

23.     In many cases, during or after contract negotiations, the Iraqi government asked the supplier to sign an auxiliary contract, usually called a "side letter," memorializing the supplier's commitment to pay the ASSFs. These side letters usually stated explicitly that the supplier agreed to pay a set amount, approximately 10% of the contract price, to the Iraqi government in advance of the arrival of the goods in Iraq.

5

24.     Some suppliers described the ASSFs as such in the contracts submitted to the

U.N. for approval, thereby leading the U.N. to believe that actual after-sales services were being

provided by the supplier.  Other suppliers disguised the ASSFs by inserting fictitious line items

into the contracts for goods or services that were not being provided.  Still other suppliers simply

inflated their contract prices by 10% to account for the payments they would make, or cause to

be made, to the Iraqi government.

### The Foreign Corrupt Practices Act

25.     The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15,

United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among

other things, making it unlawful for certain classes of persons and entities to act corruptly in

furtherance of an offer, promise, authorization, or payment of money or anything of value to a

foreign government official for the purpose of securing any improper advantage, or of obtaining

or retaining business for, or directing business to, any person.

## COUNT ONE
## (Conspiracy, 18 U.S.C. § 371)

### THE CONSPIRACY AND ITS OBJECTS

26.     Paragraphs 1 through 25 of this Information are realleged and incorporated by

reference as if set out in full.

27.     From in or around March 2001, through in or around June 2008, in the District of

Columbia and outside the jurisdiction of any particular state or district, INNOSPEC, Limited,

Alcor, Naaman, and others, known and unknown, did unlawfully and knowingly combine,

conspire, confederate, and agree to commit the following offenses against the United States:

a.      to knowingly devise, and intend to devise a scheme and artifice to defraud the United Nations and the OFFP, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, through the use of interstate and foreign wire communications, in violation of Title 18, United States Code, Section 1343;

b.      to offer, pay, promise to pay, and authorize the payment of money and other things of value to foreign officials for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist INNOSPEC, Limited, Alcor, Naaman, and others, in obtaining and retaining business for and with, and directing business to, INNOSPEC, in violation of Title 15, United States Code, Section 78dd-1; and

c.      to knowingly falsify and cause to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of Innospec, an issuer within the meaning of the FCPA, in violation of Title 15, United States Code, Sections 78m and 78ff.

## PURPOSE OF THE CONSPIRACY

28.     The primary purpose of the conspiracy was to obtain and retain lucrative business with the government of Iraq through the payment and promise of payment of kickbacks and bribes to the Iraqi government and its officials.

MANNER AND MEANS OF THE CONSPIRACY

29.     To achieve the purpose and objects of the conspiracy, INNOSPEC, Limited,

Alcor, Naaman, and others used the following manner and means, among others:

a.      It was part of the conspiracy that INNOSPEC, through Alcor, and Naaman

agreed to pay kickbacks and caused kickbacks to be paid to the Government of Iraq in exchange

for contracts awarded to Alcor by the Government of Iraq pursuant to the OFFP.

b.      It was a further part of the conspiracy that INNOSPEC, through Alcor,

submitted contracts to the U.N. which failed to disclose and concealed the fact that the prices of

the contracts had been inflated by 10% in order to generate the money that was used to pay

kickbacks to the government of Iraq.

c.      It was a further part of the conspiracy that INNOSPEC, Alcor, Naaman,

and others and caused the transmission of international wire communications to and from the

United States to give notice to the U.N. that goods had been shipped to, and inspected in, Iraq

and to give notice to Alcor's bank in Switzerland that the U.N. was authorizing payments

pursuant to the contracts.

d.      It was a further part of the conspiracy that Naaman, on behalf of

INNOSPEC, paid approximately $150,000 in bribes to officials of the MoO to ensure that

methylcyclopentadienyl manganese tricarbonyl ("MMT"), a chemical which could be used as an

alternative to TEL that is not manufactured by INNOSPEC or Alcor but is manufactured by a

competitor, failed a field trial test and therefore would not be used by the MoO as a replacement

for TEL.

8

e.    It was a further part of the conspiracy that INNOSPEC and Naaman agreed to pay and promise to pay bribes, including but not limited to money, travel, gifts, and entertainment, to officials of the MoO to obtain and retain contracts to purchase TEL from INNOSPEC and secure other benefits for INNOSPEC.

f.    It was a further part of the conspiracy that Naaman falsified invoices for reimbursement of the kickbacks and bribes in order to conceal the true nature of the payments, thereby causing Alcor to falsify its corporate books and records, which were consolidated into those of INNOSPEC.

## OVERT ACTS

30.    In furtherance of the conspiracy and to accomplish its unlawful objects, the following overt acts, among others, were committed by the defendant within the territory of the United States and elsewhere:

### Payments to the Government of Iraq

31.    On or around November 23, 2000, Alcor Manager signed a contract on behalf of Alcor with Naaman, which provided that Naaman would be Alcor's sole agent under the OFFP, and would receive a 2% commission on sales above $7,000 per metric ton.

32.    On December 14, 2001, Alcor Manager sent a letter to Naaman increasing his "commission" by 12%. This increase was comprised of the 10% kickback to the Iraqi government and an additional 2% commission for Naaman for delivering the kickback, all above and beyond Naaman's usual 2% commission.

*Contract 830584*

33.     On or around March 19, 2001, Naaman submitted a bid in response to a tender issued by the MoO for the purchase of TEL for use at Basrah Refinery. The bid was in the name of Alcor Manager on behalf of Alcor. The bid listed a price of €7,800 per metric ton.

34.     On or around March 19, 2001, the MoO issued a purchase order for the sale of TEL on the same tender. The purchase order specified a price of €8,580 per metric ton, a 10% increase over the bid.

35.     On or around April 16, 2001, Naaman signed a side letter on behalf of Alcor promising to pay a kickback of €381,888 to the Iraqi government in exchange for being awarded Contract 830584.

36.     On or around April 25, 2001, Naaman, acting on behalf of Alcor, signed a contract with the MoO for the provision of TEL to Basrah Refinery, subsequently referenced by the U.N. as Contract 830584, with a total contract price of €4,200,768. This total included the extra 10% fee promised in the side letter. This fee was concealed in contracts and correspondence with the U.N. and was intended to be used to pay a kickback to the Iraqi government through Naaman and his companies.

37.     On or around August 30, 2001, Alcor's actions caused the New York branch of BNP-Paribas to send, via an international electronic wire communication, a notice to the Union Bank of Switzerland in Zurich, Switzerland, notifying it of the issuance of a letter of credit in favor of Alcor, authorizing the eventual payment of €4,200,768 from the OFFP escrow fund maintained at BNP-Paribas to Alcor, which represented payment for Contract 830584.

38.     On or around March 4, 2002 and April 2, 2002, the arrival of a shipment TEL in Iraq caused a company based in Geneva, Switzerland, that provided commercial inspection services on behalf of the U.N. in Iraq ("the inspection company"), to send from Iraq to the U.N. in New York, via international wire communication, notification that the TEL purchased pursuant to Contract 830584 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to Alcor for Contract 830584.

39.     On or around December 20, 2001, Alcor paid Naaman approximately €39,312 in agent's fees and €196,560 to reimburse him for kickbacks paid on Contract 830584.

40.     On or around January 17, 2002, Alcor paid Naaman approximately €37,065.60 in agent's fees and €185,328.00 to reimburse him for kickbacks paid on Contract 830584.

41.     On or around April 8, 2002 and April 30, 2002, by international wire communication, BNP-Paribas transferred a total of approximately €4,186,195.99 to Alcor's account in the Union Bank of Switzerland in Zurich, Switzerland, in payment for Contract 830584.

42.     On or around May 7, 2002, Alcor paid Naaman approximately €76,377.60 in agent's fees on Contract 830584.

*Contract 930208*

43.     On or around March 29, 2001, Naaman submitted a bid in response to a tender issued by the MoO for the purchase of TEL for use at Daura Refinery. The bid was in the name of Alcor Manager on behalf of Alcor. The bid listed a price of €7,850 per metric ton.

44.     On or around March 29, 2001, Naaman submitted another bid for the sale of TEL on the same tender. The bid was in the name of Alcor Manager on behalf of Alcor. The bid listed a price of €8,700 per metric ton, an 11% increase over the original bid.

45.     On or around May 31, 2001, Naaman sent a fax to Alcor Manager, requesting that he sign the contract for the Daura Refinery tender. Naaman stated in the letter that the contract price includes a "2% + 2%" commission for his company and an additional 10% described as "Additional Money for Third Party Reimbursement."

46.     On or around June 2, 2001, Alcor Manager signed a side letter on behalf of Alcor promising to pay a kickback of €255,000 to the Iraqi government in exchange for being awarded Contract 930208.

47.     On or around June 3, 2001, Alcor Manager signed a contract with the MoO for the provision of TEL to Daura Refinery, subsequently referenced by the U.N. as Contract 930208, with a total contract price of €2,610,000, which included the extra 10% fee promised in the side letter. This fee was concealed in contracts and correspondence with the U.N. and was intended to be used to pay a kickback to the Iraqi government through Naaman and his companies.

48.     At a meeting in France on or around August 31, 2001, Naaman advised Executive A and Alcor Manager that each contract would have an additional 10% added on to the sale price, which would be "reimbursed to the client" via a bank guarantee established at the Bank of Beirut in Lebanon.

49.     On or around September 7, 2001, Alcor's actions caused the New York branch of BNP-Paribas to send, via an international electronic wire communication, a notice to the Union

Bank of Switzerland in Zurich, Switzerland, notifying it of the issuance of a letter of credit in favor of Alcor, authorizing the eventual payment of €2,610,000 from the OFFP escrow fund maintained at BNP-Paribas to Alcor, which represented payment for Contract 930208.

50.     On or around March 19, 2002, Rafidahn Bank in Beirut requested that Rafidahn Bank in Bagdad credit €255,000 to "Al Daura Refinery/Baghdad" from "Bank of Beirut-Beirut."

51.     On or around May 31, 2002, the arrival of a shipment of TEL in Iraq caused the inspection company to send from Iraq to the U.N. in New York, via international wire communication, notification that the Alcor products purchased pursuant to Contract 930208 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to Alcor for Contract 930208.

52.     On or around June 25, 2002, by international wire communication, BNP-Paribas transferred a total of approximately €2,600,740.77 to Alcor's account in the Union Bank of Switzerland in Zurich, Switzerland, in payment for Contract 930208.

*Contract 930299*

53.     On or around May 11, 2001, Naaman submitted a bid in response to a tender issued by the MoO for the purchase of TEL for use at Baiji Refinery. The bid was in the name of Alcor Manager on behalf of Alcor. The bid listed a price of €8,330 per metric ton.

54.     On or around May 11, 2001, Naaman submitted another bid for the sale of TEL on the same tender. The bid was in the name of Alcor Manager on behalf of Alcor. The bid listed a price of €9,164 per metric ton, a 10% increase over the original bid.

55.    In or around mid-2001, Naaman signed a side letter on behalf of Alcor promising to pay a kickback of €663,652 to the Iraqi government in exchange for being awarded Contract 930299.

56.    On or around July 8, 2001, Alcor Manager signed a contract with the MoO for the provision of TEL to Baiji Refinery, subsequently referenced by the U.N. as Contract 930299, with a total contract price of €7,291,000, which included the extra 10% fee promised in the side letter. This fee was concealed in contracts and correspondence with the U.N. and was intended to be used to pay a kickback to the Iraqi government through Naaman and his company.

57.    On or around October 17, 2001, Alcor sent a fax, via an international electronic wire communication, from its offices in Switzerland to the Office of the Iraq Program of the United Nations in New York, amending the contract to increase its total value to €16,495,200.

58.    On or around December 5, 2001, Alcor's actions caused the New York branch of BNP-Paribas to send, via an international electronic wire communication, a notice to the Central Bank of Iraq in Baghdad, Iraq, notifying it of the issuance of a letter of credit in favor of Alcor, authorizing the eventual payment of €16,495,200 from the OFFP escrow fund maintained at BNP-Paribas to Alcor, which represented payment for Contract 930299.

59.    On or around April 13, 2002, Rafidahn Bank in Beirut requested that Rafidahn Bank in Bagdad credit €280,724 to "Ministry of Oil / North Refineries – Baiji" from "Bank of Beirut-Beirut."

60.    On or around April 22, 2002, Rafidahn Bank in Beirut requested that Rafidahn Bank in Bagdad credit €138,450 to "North Refineries" from "Bank of Beirut-Beirut."

61.     On or around April 9, 2002, April 14, 2002, April 22, 2002, May 8, 2002, May 24, 2002, and June 18, 2002, the arrival of a shipment of TEL in Iraq caused the inspection company to send from Iraq to the U.N. in New York, via international wire communication, notification that the Alcor products purchased pursuant to Contract 930299 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to Alcor for Contract 930299.

62.     On or around May 7, 2002, May 13, 2002, May 31, 2002, June 19, 2002, and July 11, 2002, by international wire communication, BNP-Paribas transferred a total of approximately €16,415,325.32 to Alcor's account in the Union Bank of Switzerland in Zurich, Switzerland, in payment for Contract 930299.

63.     In or around 2002, INNOSPEC, through Alcor, paid Naaman a total of approximately €1,501,200 to reimburse him for kickbacks paid under Contract 930299.

*Contract 1230520*

64.     On or around July 31, 2002, Naaman submitted a bid in response to a tender issued by the MoO for the purchase of TEL for use at Daura Refinery. The bid was in the name of Alcor Manager on behalf of Alcor. The bid listed a price of €10,437 per metric ton, which included the extra 10% kickback to the Iraqi government. This fee was concealed in contracts and correspondence with the U.N. and was intended to be used to pay a kickback to the Iraqi government through Naaman and his company.

65.     On or around November 3, 2002, Naaman signed a side letter on behalf of Alcor promising to pay a kickback of €284,652 to the Iraqi government in exchange for being awarded Contract 1230520.

15

66.     On or around December 4, 2002, Alcor Manager signed a contract with the MoO for the provision of TEL to Daura Refinery, subsequently referenced by the U.N. as Contract 1230520, with a total contract price of €3,131,100, which included the extra 10% fee.

67.     On or around February 5, 2003, Alcor's actions caused the New York branch of BNP-Paribas to send, via an international electronic wire communication, a notice to the Central Bank of Iraq in Baghdad, Iraq, notifying it of the issuance of a letter of credit in favor of Alcor, authorizing the eventual payment of €3,131,000 from the OFFP escrow fund maintained at BNP-Paribas to Alcor, which represented payment for Contract 1230520.

68.     On or around July 11, 2003, the arrival of a shipment of TEL in Iraq caused the inspection company to send from Iraq to the U.N. in New York, via international wire communication, notification that the Alcor products purchased pursuant to Contract 1230520 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to Alcor for Contract 1230520.

69.     On or around July 22, 2003, by international wire communication, BNP-Paribas transferred a total of approximately €3,123,342.43 to Alcor's account in the Union Bank of Switzerland in Zurich, Switzerland, in payment for Contract 1230520.  INNOSPEC did not pay the promised kickbacks, but instead kept the additional 10% and incorporated it into its books as profit.

70.     In or around mid-2003, INNOSPEC, through Alcor, paid Naaman approximately €100,199.77 in commissions on Contract 1230520.

*Contract 1230533*

71.     On or around September 1, 2002, Naaman submitted a bid in response to a tender issued by the MoO for the purchase of TEL for use at Baiji Refinery at a price of €10,437 per metric ton, which included the extra 10% kickback to the Iraqi government. This fee was concealed in contracts and correspondence with the U.N. and was intended to be used to pay a kickback to the Iraqi government through Naaman and his company.

72.     On or around November 3, 2002, Naaman signed a side letter on behalf of Alcor promising to pay a kickback of €1,708,020 to the Iraqi government in exchange for being awarded Contract 1230533.

73.     On or around November 25, 2002, Alcor Manager signed a contract with the MoO for the provision of TEL to Baiji Refinery, subsequently referenced by the U.N. as Contract 1230533, with a total contract price of €18,788,220, which included the extra 10% fee.

74.     On or around February 11, 2003, Alcor's actions caused the New York branch of BNP-Paribas to send, via an international electronic wire communication, a notice to the Central Bank of Iraq in Baghdad, Iraq, notifying it of the issuance of a letter of credit in favor of Alcor, authorizing the eventual payment of €18,788,220 from the OFFP escrow fund maintained at BNP-Paribas to Alcor, which represented payment for Contract 1230533.

75.     On or around July 15, 2003, August 19, 2003, August 22, 2003, October 10, 2003, and November 7, 2003, the arrival of a shipment of TEL in Iraq caused the inspection company to send from Iraq to the U.N. in New York, via international wire communication, notification that the Alcor products purchased pursuant to Contract 1230533 had been received and inspected

by the inspection company in Iraq, thereby triggering payment by the U.N. to Alcor for Contract 1230533.

76.     On or around August 4, 2003, September 4, 2003, October 21, 2003, and November 20, 2004, by international wire communication, BNP-Paribas transferred a total of approximately €18,734,849.00 to Alcor's account in the Union Bank of Switzerland in Zurich, Switzerland, in payment for Contract 1230533.  INNOSPEC did not pay the promised kickbacks, but instead kept the additional 10% and incorporated it into its books as profit.

77.     On or around late 2003 through early 2004, INNOSPEC, through Alcor, paid Naaman approximately €601,218.13 in commissions on Contract 1230533.

Payments to Officials of the Government of Iraq

*2004 Long Term Purchase Agreement*

78.     On or around October 15, 2004, Alcor Manager and Officials A and B executed a contract for the provision of TEL to Iraq, referred to as a "Long Term Purchase Agreement."

79.     On or around October 10, 2005, an employee of Naaman emailed Alcor Manager and Director, referencing an order for 740 metric tons of TEL from the MoO pursuant to the Long Term Purchase Agreement, and stating that the letter of credit for payment on the order would be opened immediately, "provided we share [with Iraqi officials] half the currency fluctuation rate (4.5%) which makes it a minimum of 2% to their favor..."  He went on to state, "We are sharing most of our profits with Iraqi officials."

80.     On or around October 12, 2005, Naaman emailed Executive B, Alcor Manager, and Director, stating "With [Director's] instructions, we proceeded, as we don't want to discuss this issue in writing any further because it is so delicate, and as per [Director's] instructions that

18

we don't elaborate in writing, for which I agree. [Director] is going to agree with you on a text that you will sign and send back to us (3 + 2)."

81.    On or around October 13, 2005, Director emailed Naaman confirming that the "3 + 2" commission would be paid.

82.    On or around October 20, 2005, Director emailed Naaman language to use in a falsified invoice for reimbursement of the 2% payment for the Iraqi officials, which totaled approximately $195,912.78.

83.    In or around December 2005 and January 2006, INNOSPEC paid Naaman a total of approximately $195,912.78 to reimburse him for the payments to the Iraqi officials.

84.    On or around February 5, 2006, Naaman emailed Director regarding an order for 2000 metric tons of TEL from the MoO pursuant to the Long Term Purchase Agreement, stating that the letter of credit would be opened "provided we add up the 2% like last time."  Naaman noted that the Iraqi officials wanted their share paid in advance and stated, "Once, I received [sic] your go signal in writing, even in email, I will proceed with my payment."

85.    On or around February 10, 2006, Director authorized Naaman to make the payment.

86.    From in or around August through September 2006, INNOSPEC paid Naaman approximately €210,000 to reimburse him for the payments to the Iraqi officials.

87.    In or around January 2007, INNOSPEC paid Naaman approximately $139,650 to reimburse him for the payments to the Iraqi officials.

*MMT Test*

88.     On or around September 13, 2006, Naaman emailed Director, advising him that the MoO was testing MMT and, if it passed the test, the MoO would purchase 350 metric tons of MMT, reducing the amount of TEL the MoO would purchase from INNOSPEC, stating, "My advise [sic] is to follow my plan on the testing of the MMT... and to move forward immediately on the implementation to make the test fail, so there will be no more MMT order."

89.     On or around September 16, 2006, Naaman faxed Director a letter, attaching a falsified invoice for $105,000, to cover "payment for additional technical support and security operations required to nurture and protect the ongoing TEL business in Iraq."

90.     On or around September 18, 2006, Director approved the falsified invoice for payment through Alcor, with the note, "Best to allocate to agents commissions."

91.     On or around February 28, 2007, Naaman sent a letter to Director enclosing an English translation of the MoO field trial test for MMT, and noting that MMT had failed the test. Naaman wrote that in order to ensure that MMT failed the test, he "had to pay an additional fee to make sure that the report will come to our advantage." Naaman requested an "additional $50,000/- cost incurred.... Accordingly, enclosed is Interact's invoice for the additional amount...." and attached a falsified invoice from Naaman's company, Interact S.A.R.L., requesting payment of $50,000 for "training of Daura Refinery blending unit team in Jordan..."

92.     On or around March 21, 2007, Naaman sent an email to Director noting that the payment of the additional $50,000 was still outstanding.

93.     In or around late September 2006 and April 3, 2007, INNOSPEC paid Naaman a total of approximately $155,000 to reimburse him for the payments to the Iraqi officials.

*2008 Long Term Purchase Agreement*

94.    In or around 2007, INNOSPEC, through Naaman, began negotiations for a new Long Term Purchase Agreement.

95.    On March 21, 2007, Naaman emailed Director, noting that the payments to Iraqi officials to secure the failure of the MMT test "was not the real cost of rejecting MMT... The real cost should be the increase of our remuneration on TEL for future business, i.e. the remaining 2000 tons of fiscal year 2007 and the new LTPA will be 5%. This additional money will cover my promise to these people for the loss of their remuneration from MMT, which is a very small price we are paying versus the loss of my money and your money if MMT were admitted in. I trust that you will approve this, as I have already promised them..."

96.    On November 20, 2007, Naaman sent Director a chart of bidders on an official tender for TEL, noting, "Please keep this information extremely confidential as nobody have [sic] yet leaked this information in public. It is only with the Minister of Oil and key personnel from the Ministry of Oil..."

97.    On or around November 20, 2007, Naaman emailed Director, stating "Remuneration - have to be raised up to keep everybody on board, happy and satisfied. I suggest that if you want to raise the price to the $18,000 level, then to give us a higher remuneration percentage to read seven pct (7%) for a target price of $18,000 plus. This will leave me a way to negotiate in my next meeting with them, based on your directions set up last July in Nice meeting [sic], i.e. remuneration vs. volume and price."

98.     In or around January 2008, Naaman and Director traveled to Lebanon to finalize

negotiation of the Long Term Purchase Agreement and on or around January 24, 2008, Naaman,

Director, and Official A executed the agreement pending approval of the Minister of Oil.

99.     On or around June 1, 2008, the Long Term Purchase Agreement entered into

effect.

100.    On or around January 29, 2009, the MoO opened a letter of credit in favor of

Alcor for a total of approximately $17,000,000.

*Travel*

101.    In or around Summer 2002, Naaman, INNOSPEC, and Alcor Manager offred the

MoO a visit by eight officials of the Iraqi government to Zug, Switzerland, during which the

officials spent one morning on a visit to Alcor's Swiss offices and four days sightseeing. In

arranging the trip with Alcor Manager, Naaman stated, "...concerning the invitation to Iraqi

Delegation to visit Switzerland for training and technical knowledge by in principle one morning

office visit and rest, Tourism." He also noted, "This is a good opportunity for Alcor to receive

the delegation specially that the goods have been delivered for all refineries in Iraq, South,

Midland and North Refineries, which will give you a support [sic] for the current tenders under

Phase No. 11 and future business." Estimated cost of the offered visit was $36,500, including

$9,000 in "pocket money," cash to be given directly to the officials.

102.    In or around early 2005, Naaman emailed Alcor Manager, Director, and

Employee A regarding the travel of Iraqi officials to the United Kingdom, including Official B.

In arranging the trip with Employee A, an employee of Naaman stated, "Kindly arrange for 8

envelopes with the name of each delegate.  In each envelope, put GBP 1,000/- except for the

envelope for [Official B], put GBP 2,000/- since he is the delegation head. [Employee A] can personally give this to each delegate upon arrival in UK. Please arrange to give the tour guide...enough petty cash to spend with the Iraqi delegates..."

103.    In or around June 2005, in connection with the trip to the United Kingdom, INNOSPEC spent approximately $11,050 on transportation; $8,705 on accommodations for ten nights; and $10,000 in "pocket money," cash given directly to the officials, for a total of approximately $29,755.

104.    On or around March 15, 2006, an employee of Naaman emailed Director regarding reimbursement for a three-day trip of Officials B and C to Dubai. The employee stated, "[T]he pocket money of the delegates has been paid by Mr. Naaman through myself, but what we invoiced you is only the official pocket money... I can confirm to you that what Mr. Naaman has paid to each delegates [sic] pocket money and shopping expenses which is more than the total amount in the invoice we sent."

105.    On or around March 31, 2006, INNOSPEC paid Naaman approximately $13,750 to reimburse him for the costs of the travel of Officials B and C to Dubai, including $3,000 in "per diem" payments.

106.    On or around August 2, 2006, Naaman emailed Director regarding the travel of Official C to Amman. Naaman stated, "...you know this man is high official [sic] employee; he is the deputy Minister of Oil responsible for all refineries business. We should accommodate him to his program as he is doing us a favour by coming... and risking his career. After you finish the meeting with him by the 13[th], he will be travelling [sic] on your account to Thailand for one week with his wife..."

107.    On or around August 2, 2006, Director emailed Naaman, confirming that INNOSPEC would pay for Official C's vacation with his wife in Thailand.

108.    On or around August 7, 2006, Director emailed an employee of Naaman, stating, "As regards payment, please send the invoice to me and I will arrange this... however, I do not want to see an invoice for the tickets for his holiday and spending money, rather, I would be grateful if you could send me an invoice for the $13,076 along the lines of "payment for airfares for trip to Amman for [Official C and his wife] for business discussions..."

109.    On or around August 11, 2006, INNOSPEC paid Naaman approximately $13,076 to reimburse him for the costs of the travel of Official C and his wife to Thailand, including $5,000 in "pocket money."

110.    On or around January 30, 2008, Naaman invoiced Alcor for reimbursement of $34,480 to cover the cost of the travel of the three Iraqi MoO officials to Lebanon for the half-day meeting to finalize the 2008 Long Term Purchase Agreement, including hotel accommodations for six days, $1,800 for "Entertainment, lunches, & dinners in Lebanon," $1,650 for "mobile phone cards for international calling + 3 cameras," and $15,000 in "pocket money."

### Books and Records

111.    In order to conceal the kickback payments to the Iraqi government for contracts under the OFFP on the books and records of Alcor, on or around December 19, 2001, January 19, 2002, and February 11, 2002; Naaman sent Alcor invoices misrepresenting the kickbacks on Contracts 803584, 930208, and 930299 as "remuneration for after sales services."

24

112.    In order to conceal the payments to the Iraqi officials on orders under the 2004 Long Term Purchase Agreement on the books and records of Alcor, Alcor recorded the payments to reimburse Naaman for the bribes as "commissions."

113.    Based on Naaman's false invoices, from in or around 2001 to in or around 2008, Alcor improperly characterized the kickback and bribe reimbursement payments to Naaman as "commissions" and "sales promotion expenditures" on its books and records.

114.    At the end of each of INNOSPEC's fiscal years from in or around 2001 to in or around 2008, the books and records of Alcor, including those containing false characterizations of the kickback payments given to the Iraqi government and bribes paid to Iraqi officials, were incorporated into the books and records of INNOSPEC for purposes of preparing INNOSPEC's year-end financial statements, which were filed with the Securities and Exchange Commission in Washington, D.C.

(All in violation of Title 18, United States Code, Section 371.)

## COUNTS TWO THROUGH SIX
### (Wire Fraud, 18 U.S.C. §§ 1343 and 2)

115.    Paragraphs 1 through 25 and 31 through 114 of this Information are realleged and incorporated as if fully set forth here as constituting the scheme and artifice to defraud referred to herein.

116.    From in or about March 2001, up to and including in or around July 2003, INNOSPEC, Alcor, and others known and unknown, unlawfully, willfully, and knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted, caused to be transmitted, and aided and abetted the transmittal of international wire

communications for the purpose of executing such scheme and artifice, all as more fully set forth below.

117.    On or about the dates set forth below, in the United States and elsewhere, the defendant and others did cause to be transmitted by means of wire communications in international commerce, and aided and abetted the transmittal of, wire transfers from the United Nations Escrow Account located at BNP-Paribas in New York, New York, to the account of Alcor in Zug, Switzerland, in payment on contracts procured through the scheme or artifice to defraud, as described below:

| Count | Contract | Date Payment Received |
|-------|----------|----------------------|
| TWO | 830584 | On or around April 5 and 29, 2002 |
| THREE | 930208 | On or around June 25, 2002 |
| FOUR | 930299 | On or around May 7 through July 11, 2002 |
| FIVE | 1230520 | On or around July 22, 2003 |
| SIX | 1230533 | On or around September 4 through November 20, 2002 |

(All in violation of Title 18, United States Code, Sections 1343 and 2)

## COUNTS SEVEN THROUGH ELEVEN
### (Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, 18 U.S.C. § 2)

118.    The allegations of paragraphs 1 through 25 and 31 through 114 of this Information are realleged and incorporated by reference as though set in forth in full.

119.    On or about the dates set forth below, in Iraq and elsewhere outside of the jurisdiction of any particular state or district of the United States, but within the extraterritorial jurisdiction of the United States pursuant to Title 15, United States Code, Section 78dd-1(g), and,

therefore, pursuant to Title 18, United States Code, Section 3238, within the venue of the United

States District Court for the District of Columbia, defendant INNOSPEC, an issuer organized

under the laws of the United States, willfully and corruptly did an act outside the United States in

furtherance of an offer, payment, promise to pay, or authorization of the payment of money to

officials of the Iraqi government for purposes of (i) influencing acts and decisions of such

foreign officials in their official capacity; (ii) inducing such foreign officials to do and omit to do

acts in violation of the lawful duty of such officials; (iii) securing an improper advantage; and

(iv) inducing such foreign officials to use their influence with a foreign government and

instrumentalities thereof to affect and influence acts and decisions of such governments and

instrumentalities, in order to assist INNOSPEC, in obtaining and retaining business for and with,

and directing business to, INNOSPEC and Alcor, by paying Iraqi officials within the MoO to

award contracts to INNOSPEC and Alcor and cause MMT to fail a field test thereby ensuring

that MMT would not be purchased by the MoO instead of TEL.

| Count | Date | Amount of Payment Made or Promised |
|---|---|---|
| SEVEN | In or around October 2005 | approximately $195,912.78 |
| EIGHT | In or around late 2006 to early 2007 | approximately $407,904 |
| NINE | In or around mid- to late 2006 | approximately $100,000 |
| TEN | In or around Spring 2007 | approximately $50,000 |
| ELEVEN | In or around January 2008 | approximately $850,000 |

(All in violation of Title 15, United States Code, Section 78dd-1 and Title 18, United States
Code, Section 2)

## COUNT TWELVE
### (Foreign Corrupt Practices Act, 15 U.S.C. § 78m, 18 U.S.C. § 2)

120.    The allegations of paragraphs 1 through 25 and 31 through 114 of this

Information are realleged and incorporated by reference as though set in forth in full.

121.    From in or around 2001 to in or around 2008, in the District of the District of

Columbia and elsewhere, at the end of each of INNOSPEC's fiscal years, the books and records

of Alcor contained false characterizations of the kickback payments given to the Iraqi

government and bribes paid to Iraqi officials, as "remuneration for after sales service fees,"

"commissions," and "sales promotions expenditures," and those books and records of Alcor were

incorporated into the books and records of INNOSPEC for purposes of preparing INNOSPEC's

year-end financial statements, which were filed with the Securities and Exchange Commission in

Washington, D.C.


                            DENIS McINERNEY
                            Chief, Fraud Section


                    By:   _____
                            Kathleen M Hamann
                            Trial Attorney
                            Fraud Section, Criminal Division
                            United States Department of Justice
                            1400 New York Avenue, NW
                            Washington, D.C.  20530
                            (202) 305-7413


Date:  March 5, 2010