FILED

MAR 18 2010

U.S. DISTRICT COURT CLERK

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO.** ___IC-0061 (ESH)___ |
| | : | |
| **Plaintiff,** | : | |
| | : | **VIOLATIONS: 18 U.S.C. §§ 371, 1343,** |
| | : | **and 2 and 15 U.S.C. §§ 78m and 78dd-1** |
| **v.** | : | **(Conspiracy, Wire Fraud, and Foreign** |
| | : | **Corrupt Practices)** |
| **INNOSPEC INC.,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## DEPARTMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its counsel, the United States Department of Justice, Criminal Division, Fraud Section (the "Department"), submits this Sentencing Memorandum in the above-captioned matter. For the reasons outlined below, the Department respectfully submits that the Court should accept the guilty plea of Innospec Inc. ("Innospec") and sentence it in accordance with the parties' agreement.

### I. BACKGROUND

Innospec Inc., through its various subsidiaries and operating companies, is the world's only manufacturer of tetraethyl lead ("TEL"), an anti-knock compound used as an additive in leaded gasoline and certain types of aviation fuel. Innospec is incorporated in Delaware and trades on the NASDAQ. Until 2006, Innospec was known as Octel Company and was traded on the New York Stock Exchange. Innospec has approximately 1,000 employees working around the world. It is headquartered in Ellesmere Port in the United Kingdom.

Innospec Limited ("Limited") is a wholly-owned subsidiary of Innospec and is incorporated in the United Kingdom.  Limited has no separate corporate personality from its parent, Innospec.  In 1999, Innospec purchased OBO Adler Company Ltd., including its Swiss subsidiary, Alcor Chemie Vertriebs GmBH ("Alcor").  Alcor is headquartered in Zug, Switzerland and operated a TEL manufacturing facility located in Döberitz, Germany until that facility was closed in 2002.  Alcor activities were overseen and controlled by Innospec.

Alcor was identified in the report of the Independent Inquiry Commission into the United Nations Oil for Food Program as one of the companies that paid kickbacks to the government of the Republic of Iraq ("Iraq") in exchange for contracts under the Oil for Food Program ("OFFP").  As a result, the Securities and Exchange Commission ("SEC") issued subpoenas to Innospec in February 2006 and the Department opened an investigation into Innospec in December 2006. In the course of its investigation, the Department identified evidence of improper payments to Iraqi officials subsequent to the end of the OFFP.  Although Innospec initially denied culpability, the company has been cooperating with the Department since early 2008, including conducting an extensive internal investigation that resulted in the identification of additional improper payments to officials in Indonesia.

Based on a referral from the Department, the Serious Fraud Office of the United Kingdom ("SFO") opened an investigation into Innospec's misconduct under the OFFP in May 2008 and a separate investigation into the additional bribery conduct in July 2008.  U.K. law enforcement authorities advise that Innospec has cooperated fully with their investigation.

In August 2008, the Department identified evidence of potential violations of U.S. sanctions laws and referred those matters to the Department of the Treasury, Office of Foreign

Assets Control ("OFAC").  OFAC informed the Department that in 2005, Innospec had

voluntarily disclosed to OFAC possible violations of the Trading with the Enemy Act

("TWEA"), 50 U.S.C. App. § 1, *et seq.*, and the Cuban Assets Control Regulations, 31 C.F.R. §

515.101, *et seq.*

As described below, Innospec seeks to reach comprehensive settlement with the

Department, the SEC, the SFO, and OFAC.  Due to financial difficulties, however, the company

is unable to pay the full civil and criminal fines and penalties that the agencies would have

assessed in the ordinary course.

## II. SUMMARY OF FACTS

### A.  Charged Conduct

From 2001 to 2008, Innospec paid, or promised to pay, in excess of $5,800,000 in

kickbacks to the Iraqi government and bribes to Iraqi officials to secure contracts to sell TEL to

the Iraqi Ministry of Oil ("MoO").  Innospec earned more than $50,000,000 in profits on those

contracts.

### 1.  *Kickbacks Paid Under the OFFP (Wire Fraud)*

On  August 6, 1990, days after Iraq's invasion of Kuwait, the U.N. adopted Security

Council Resolution 661, which prohibited U.N. member states from transacting business with

Iraq, except for the purchase and sale of humanitarian supplies.  Resolution 661 prohibited

virtually all direct financial transactions with the government of Iraq.  In April 1995, the U.N.

adopted Security Council Resolution 986, which provided a limited exception to the Iraq

sanctions regime in that it allowed Iraq to sell its oil.  However, Resolution 986 required that the

proceeds of oil sales be used by the Iraqi government to purchase humanitarian supplies for the

Iraqi people, including food and equipment to maintain and service Iraq's oil sector.  Hence, this program became known as the Oil for Food Program.

Under the provisions of the OFFP, a supplier of humanitarian goods contracted with a ministry or other department of the Iraqi government to sell goods to the Iraqi government.  Once that contract was finalized, the contract was submitted to a U.N. Committee  (the "661 Committee") which reviewed the contracts  to ensure that their terms complied with all OFFP and Iraqi sanction regulations.  The rules of the OFFP required that the proceeds from all sales of Iraqi oil be deposited into a U.N.-controlled escrow account at the New York branch of Banque Nationale de Paris ("BNP-Paribas").  That escrow account funded the purchase of humanitarian goods by the Iraqi government. If a contract was approved by the 661 Committee, a letter of credit was issued by the New York branch of BNP-Paribas to the supplier's bank stating that the supplier would be paid by the OFFP for the relevant goods once certain conditions were met, including delivery of the goods to Iraq and inspection of the goods by a U.N. contractor.  Once those conditions were deemed by the U.N. to have been met, the U.N. would direct BNP-Paribas to release payment to the supplier.

Beginning in August 2000, the Iraqi government demanded that suppliers of humanitarian goods pay a kickback, usually valued at 10% of the contract price and often termed "after sales service fees" ("ASSFs"), to the Iraqi government in order to be awarded a contract by the government.  These kickbacks violated U.N. OFFP regulations and U.N. sanctions which prohibited payments to the Iraqi government which were not expressly approved by the U.N. and which were not contemplated by OFFP guidelines.

4

In many cases, during or after contract negotiations, the Iraqi government asked the supplier to sign an auxiliary contract, usually called a "side letter," memorializing the supplier's commitment to pay the ASSFs. These side letters usually stated explicitly that the supplier agreed to pay a set amount, approximately 10% of the contract price, to the Iraqi government in advance of the arrival of the goods in Iraq.

From 2001-2004, Innospec, through Alcor, entered into five contracts with the MoO for the sale of TEL to Iraqi oil refineries under the auspices of the OFFP. On each contract, Alcor signed a side letter promising to pay approximately 10% of the contract price as a kickback to the Iraqi government. On the first three contracts, Alcor paid ASSFs totaling €2,138,088. On the last two contracts, Alcor promised to pay an additional €2,191,932 in ASSFs, but due to the intervening war in Iraq, the contracts were completed after the fall of the Hussein government. Innospec did not pay the ASSFs on the last two contracts, but rather kept the funds as profits. In total, Innospec made approximately $23,125,820 in profit on the five contracts.

Innospec admits that on the first three contracts, it submitted a commercial bid to the MoO via Ousama Naaman, its agent in Iraq.[1] On the same day, Naaman submitted a revised bid that added 10% to the bid price. Naaman was then paid a commission totaling 14% of the total contract value. That commission included Naaman's normal 2% commission, the 10% kickback to the Iraqi government, and an extra 2% for Naaman for handling the kickback. Innospec

---

[1] Ousama Naaman was indicted under seal in the District of Columbia on August 8, 2008 and an arrest warrant was issued. The Indictment charges him with conspiracy, wire fraud, and violations of the Foreign Corrupt Practices Act in connection with the payment of kickbacks and bribes on behalf of Innospec and its subsidiaries. Naaman was arrested in Frankfurt, Federal Republic of Germany, on July 30, 2009, pursuant to an Interpol diffusion notice on the U.S. arrest warrant. The Indictment of Naaman is now unsealed. The Department is seeking his extradition from Germany to stand trial before this Court.

referred to this as the "10+2+2" commission.  On the last two contracts, only one bid was submitted, which already included the additional 10% kickback.

Innospec admits that its former Chief Executive Officer ("CEO") was aware of both the OFFP contracts and the existence of the ASSFs and approved the payment of the kickbacks. Emails produced by Innospec confirm that a number of senior executives of Innospec and Alcor were aware of and approved the kickback payments.

2.    *Bribes Paid to Iraqi Officials Subsequent to the OFFP (FCPA)*

In 2004, after the termination of the OFFP, Alcor signed a long-term purchase agreement with the MoO for the sale of TEL.  On three shipments under that agreement, Innospec routed a payment of approximately 2% of the total shipment value to Naaman for him to pass on to Iraqi officials.  On some occasions, Naaman provided Innospec false invoices to support the payments, which were paid by Alcor.

During mid-2006, Naaman reported to a senior executive of Innospec (described as "Director" in the Information) that Naaman had discovered that the MoO was conducting a test of a product manufactured by a competitor,[2] methylcyclopentadienyl manganese tricarbonyl ("MMT"), to determine if it was a viable alternative to TEL as an anti-knock compound. Naaman relayed to Director that if MMT passed the test, the MoO planned to place an order with the competitor for 350 metric tons of MMT.  With Director's authorization, Naaman paid an initial $100,000 bribe, and later an additional $50,000 bribe, to officials in the MoO to ensure that MMT did not pass the test.  Under instructions from Director, on at least one shipment, Naaman subsequently provided a false invoice to Innospec for reimbursement for the corrupt

---

[2] The competitor is also a U.S. company.

payments, which Alcor paid with Director's approval.  MMT failed the test and no MMT was purchased by the MoO.

In January 2008, more than a year after the Department's criminal investigation began, Innospec signed a new long-term production agreement with the MoO.  Although the MoO only required approximately 1,200 metric tons of TEL per year, the MoO agreed to purchase a minimum of 2,000 metric tons annually for the life of the agreement.  Innospec secured the agreement through the promise of a kickback to the Iraqi MoO officials of between 5-7% of the total contract value.  In January 2009, the MoO opened a letter of credit for $17,000,000 for initial TEL purchases under the agreement.  No shipments were ultimately made under the contract due to the intervening investigation.

Also between 2002 and 2008, Innospec on several occasions offered and paid for travel expenses for Iraqi officials, including providing them with thousands of dollars in "pocket money" during the trips.  In addition to the pocket money, Naaman, with the knowledge of Innospec, spent thousands of dollars taking the Iraqi officials shopping during their travel.  In 2006, Innospec agreed to pay for an Iraqi official's honeymoon in Thailand in exchange for his assistance on Innospec's behalf in an arbitration against a competitor (the same competitor who attempted to sell MMT in Iraq) in the United Kingdom.  In 2008, Innospec paid for three Iraqi officials' travel to Beirut, Lebanon, for a half-day meeting to sign the 2008 long term production agreement.  Expenses included four days' accommodation, entertainment, meals, phone cards, cameras, and $5,000 in pocket money per official.  The total cost of the trip was $34,480.

In total, between 2004 and 2008, Innospec paid or promised approximately $1,736,387 in bribes to Iraqi government officials.  The contracts during that period resulted in $30,647,788 in profits for Innospec.

### 3.   *Books and Records*

All of the kickbacks to the Iraqi government under the OFFP were mischaracterized on the books and records of Innospec as "after sales service fees," based on false invoices from Naaman.  The bribes to Iraqi officials were mischaracterized on the books and records of Innospec as "commissions," and "sales promotion expenditures."  In many cases, Naaman provided Innospec false invoices to support the bribes.

## B.   **Relevant Conduct**

### 1.   *Violations of the Trading With the Enemy Act and Cuban Embargo Regulations*

In 2001, Innospec, through a wholly-owned subsidiary, acquired the Bycosin Group, made up of two Swedish companies, Bycosin Invest AB and Bycosin AB, and their subsidiaries. Among those subsidiaries were Bycosin de Mexico SA de CV ("BdM") and Bycosin SA de CV ("BYSA").  BdM and BYSA were owned in part by Bycosin AB and in part by Bycosin Corporation, which is incorporated in the United States, in the state of Washington.  At the time of acquisition, BdM and BYSA conducted business with La Empresa Importadora de Abastecimientos del Petróleo Abapet ("Abapet") and Empresa Importadora de Objectivos Electroenergeticos ("Energo"), two Cuban state-owned power plants, to which BdM and BYSA sold fuel additive products.

Around February 19, 2001, the Board of Directors of Innospec (then Octel Corp.) approved the acquisition of the Bycosin Group.  Early in the due diligence process, Innospec's

acquisition teams noted that BdM and BYSA had contracts with Cuba. On or around March 29, 2001, the acquisition project manager briefed Innospec senior management and highlighted the Cuban business as a significant due diligence issue. Senior members of Innospec management, including Innospec's then-CEO, authorized the acquisition of the Bycosin Group notwithstanding its transactions with Cuba, but decided that the acquisition would be by a U.K. subsidiary of Innospec, rather than the U.S.-incorporated parent company. The senior management of Innospec did not brief Innospec's Board of Directors regarding the Cuba business or its decision to acquire that business.

From the time of acquisition until 2005, Innospec continued to conduct business with Cuba through BdM and BYSA. That business was overseen locally on a day to day basis by Antonio Cruz Reyes, Bycosin's agent in Cuba. Mr. Cruz Reyes was, and still is, on a list published by the Office of Foreign Assets Control of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. Collectively, such individuals and companies are called "Specially Designated Nationals" or "SDNs." By U.S. regulation, the assets of SDNs are blocked and U.S. persons are generally prohibited from dealing with them.

In January 2004, Innospec refinanced its primary credit facility. The resulting due diligence revealed the U.S. legal issues surrounding the Bycosin Group's Cuban business and Mr. Cruz Reyes' listing as an Specially Designated National. As a result, Innsopec sold BdM and BYSA to a non-U.S. third party in November 2004 and voluntarily disclosed its violations of the Cuba embargo to OFAC. Performance on contracts signed during Innospec's ownership of the Cuban business continued until around November 2005.

In total, Innospec sold nearly $20,000,000 in oil soluble fuel additives to Cuban state-owned power plants Abapet and Energo without a license from the Secretary of the Treasury permitting it to do so.  In addition, in 2003 and 2004, Innospec facilitated the travel of an SDN into and out of Cuba.

2.      *Bribes Paid to Indonesian Government Officials*

From approximately 2000 until 2005, Innospec paid bribes to Indonesian government officials to induce the purchase of higher levels of TEL than Indonesia required and to extend the life of TEL sales in Indonesia.  This conduct is not charged in the Information in this case, as Innospec is pleading guilty to this conduct in the United Kingdom.

From around 2000 to around 2004, Innospec, through its local agent in Indonesia, paid an Indonesian official at the state-owned gas company, MIGAS, $40 for every metric ton of TEL sold into Indonesia over 4000 metric tons.  For every metric ton over 5,000, Innospec paid the Indonesian government official $50 per metric ton.  Innospec's local agent provided false invoices for travel and other expenses to support the payments.  These payments were approved by Director and the then-CEO.

From 2000 to 2005, the Indonesian government was considering switching Indonesia to unleaded gasoline, which does not require TEL.  Such a switch would have ended TEL sales in Indonesia.  Innospec, with the approval of the CEO, agreed to pay an Indonesian official employed by Pertamina, the state-owned oil company, $500 per metric ton of TEL sold, in order to cause the Indonesian government not to switch to unleaded gasoline, thereby extending the life of TEL sales in Indonesia.

Payments to MIGAS and Pertamina officials from 2000 to 2005 totaled approximately $2,883,507.  During that time frame, Innospec's profits from sales to Indonesia were approximately $21,506,610.

## III. CRIMINAL PENALTIES

### A.    Statutory Maximum Penalties

The Court may impose the following statutory maximum sentences:  Count One (conspiracy), a fine of the greater of $500,000 or twice the gross gain from the misconduct, and a $100 special assessment; Counts Two through Six (wire fraud), a fine of the greater of $500,000 or twice the gross gain from the misconduct, and a $100 special assessment; Counts Seven through Eleven (Foreign Corrupt Practices Act), a fine of the greater of $2,000,000 or twice the gross gain from the misconduct, and a $100 special assessment; and Count Twelve (books and records), a fine of $25,000,000 and a $100 special assessment.  Thus, the total possible maximum sentence in this case is a $322,641,648 fine and a mandatory $2,400 special assessment.  The Court may also impose up to five years of organizational probation.

### B.    Sentencing Guidelines

As set forth in paragraph 4 of the plea agreement, the parties agree that the following Sentencing Guidelines provisions, using the 2008 Sentencing Guidelines Manual, apply based on the facts of this case, for purposes of determining an advisory guideline range:

*1.    Wire Fraud*

| | | |
|---|---|---|
| § 2B1.1(a)(2) | Base offense level | 6 |
| § 2B1.1(b)(2) | Total value/profit between $20-50 million | 22 |
| § 2B1.1(b)(9) | Significant conduct outside U.S./ sophisticated means | 2 |
| TOTAL OFFENSE LEVEL | | 30 |

*2.      Foreign Corrupt Practices Act - Antibribery Provisions*

| | | |
|---|---|---|
| § 2C1.1(a)(2) | Base offense level | 12 |
| § 2C1.1(b)(1) | More than one bribe | 2 |
| § 2C1.1(b)(2) | High level official | 4 |
| § 2C1.1(b)(2) | Total value/profit between $7-20 million | 20 |

TOTAL OFFENSE LEVEL                                                      38

*3.      Foreign Corrupt Practices Act - Books and Records Provisions*

| | | |
|---|---|---|
| § 2B1.1(a)(1) | Base Offense Level | 7 |
| § 2B1.1(b)(1)(M) | Total value/profit between $20-50 million | 24 |
| § 2B1.1(b)(9) | Significant conduct outside U.S./ sophisticated means | 2 |

TOTAL OFFENSE LEVEL                                                      33

*4.      Combined Offense Level*

| | | |
|---|---|---|
| § 3D1.4 | Number of units/increase in offense level | 2 |

COMBINED OFFENSE LEVEL                                                   40

*5.      Calculation of Culpability Score:*

| | | |
|---|---|---|
| § 8C2.5(a) | Base Score | 5 |
| § 8C2.5(b)(1) | More than 200 employees and high-level personnel involvement/pervasive tolerance | 3 |
| § 8C2.5(g)(2) | Acceptance of Responsibility | -1 |

TOTAL CULPABILITY SCORE                                                   7

*6.      Calculation of Fine Range:*

Base Fine: Greater of the amount from table in
U.S.S.G. § 8C2.4(a)(1) & (d) corresponding to offense
level of 40 ($72,500,000), or the pecuniary gain/loss
from the offense ($53,773,608)
(U.S.S.G. § 8C2.4(a)(2)):                                    $72,500,000

Multipliers, culpability score of 7 (U.S.S.G. § 8C2.6):      1.4-2.8

***FINE RANGE (U.S.S.G. § 8C2.7):***          ***$101.5 million - $203 million***

**B.**     **Innospec's Ability to Pay**

Pursuant to U.S.S.G. § 8C3.3(b):

> The court may impose a fine below that otherwise required by § 8C2.7 (Guideline
> Fine Range - Organizations)... if the court finds that the organization is not able
> and, even with the use of a reasonable installment schedule, is not likely to
> become able to pay the minimum fine required by § 8C2.7.... *Provided,* that the
> reduction under this subsection shall not be more than necessary to avoid
> substantially jeopardizing the continued viability of the organization.

(Emphasis in original.)  Innospec has represented that it is unable to pay, and, even with the use

of a reasonable installment schedule, is not likely to be able to pay, a $101.5 million fine.  Over

the course of nearly a year, Innospec has provided the Department, the SEC, OFAC, and the SFO

(collectively, the "U.S. and U.K. government authorities") with detailed presentations regarding

its current financial condition and available assets.  Those representations have been analyzed in

detail by qualified accounting professionals within the SEC and the SFO.

Innospec has represented that, were the company to pay more than the amount agreed, the

continued viability of the company would be threatened, as follows: (1) Innospec would breach

the limits of its credit facilities; (2) Innospec would be unable to make up a deficit in funding its

pension plan, resulting in an $85 million shortfall; (3) Innospec would be unable to remediate

certain environmental damage caused by its manufacturing facility in the United Kingdom; (4)

Innospec would be unable to invest sufficiently in research and development; and (5) Innospec

would be forced to close facilities around the world, resulting in dozens of employees losing their

jobs.  Innospec's representations with regard to its ability to pay are set forth in the affidavit of

Innospec's Chief Financial Officer, Ian Cleminson, attached hereto as Exhibit A.  Mr. Cleminson

will be present at the sentencing hearing and available to answer any questions the Court may have regarding Innospec's ability to pay.

In close consultation with the U.S. and U.K. government authorities, Innospec developed a five-year payment plan. Under the payment plan, Innospec represents that the maximum amount that the company is able to pay in fines and penalties to the U.S. and U.K. government authorities over the five-year period is $40.2 million. This total includes both fixed and contingent payments, as described below.

1.    *Fixed Payments*

Under the plan, Innospec would make five fixed payments, the first due 30 days after it is sentenced by this Court. Subsequent payments will be made on or before December 31 of each year of the plea agreement, as follows:

| | |
|---|---|
| Initial Payment | $10,000,000 |
| December 31, 2010 | $5,150,000 |
| December 31, 2011 | $5,150,000 |
| December 31, 2012 | $4,750,000 |
| December 31, 2013 | $3,750,000 |
| **TOTAL** | **$28,800,000** |

2.    *Contingent Payments*

Innospec is expected to sell approximately of 1,200 metric tons of TEL, or related products, to Iraq each year until at least 2012.[3] Innospec is unable to predict with reasonable certainty when those sales will occur, and therefore is not able to commit a portion of its profits from such sales in a fixed payment plan. Innospec's profits from such sales will be

---

[3] Innospec has not sold TEL to Indonesia since 2005, when Indonesia ceased using leaded gasoline. Innospec anticipates that Iraq will likewise move to unleaded gasoline some time in 2012.

approximately $7,500 per metric ton. Innospec and the U.S. and U.K. government authorities have therefore agreed that Innospec will contribute $4,000 of its profits per metric ton of TEL or similar products sold to Iraq toward paying the combined fines and penalties in this matter, payable on or before December 31 of each year. By agreement of the parties, contingent payments based on Iraq sales will be capped at a total of $11.4 million.

## C.   Fines, Penalties, and Disgorgement to be Paid to Other Enforcement Agencies

As mentioned above, Innospec seeks to simultaneously settle enforcement actions with each of the U.S. and U.K. government authorities. Were each of the four agencies to seek what would be appropriate penalties in the normal course, the total in criminal fines, civil penalties, disgorgement, and pre-judgment interest would exceed $400 million. In light of Innospec's inability to pay such a fine, each agency has agreed to significantly reduce the penalties for Innospec's misconduct, as follows:

### 1.   *The Securities and Exchange Commission*

The SEC anticipates settling a civil action against Innospec simultaneously with Innospec's guilty plea before this Court. This civil settlement relates to the kickbacks to the government of Iraq and the bribery of public officials in Iraq and Indonesia. The SEC would normally seek disgorgement of all profits from the misconduct, plus pre-judgement interest, and appropriate civil penalties. In this case, the SEC has advised that would include disgorgement of profits from the Oil for Food, post-Oil for Food, and Indonesia misconduct, described in Part II above, and as such, disgorgement and penalties would total in excess of $100 million. In light of Innospec's inability to pay such a fine, Innospec and the SEC have agreed that Innospec will disgorge $11.2 million to the SEC, paid over time.

2. *The Office of Foreign Assets Control ("OFAC")*

OFAC anticipates settling with Innospec for violations of the United States embargo against Cuba. OFAC estimates that Innospec would normally face a fine of at least $4.3 million, based on the number of transactions and nature of the violations. In light of Innospec's inability to pay and Innospec's agreement with the other government agencies, OFAC has agreed to reduce its fine to $2.2 million, paid over time. The Department has also agreed to forego any criminal penalty for the Cuba misconduct in this case in light of the OFAC fine, Innospec's voluntary disclosure of the Cuba misconduct to OFAC, and Innospec's inability to pay.

3. *The United Kingdom's Serious Fraud Office*

Subject to the approval of the Crown Court, Innospec anticipates pleading guilty to violating the United Kingdom's anti-bribery law in connection with the corrupt payments to Indonesian public officials on March 18, 2010. In addition, Innospec will enter into a civil settlement regarding violations of United Kingdom sanctions laws in connection with the shipments of TEL into Iraq. While the criminal fine or other penalties to which Innospec is ultimately sentenced in the U.K. is entirely in the discretion of the Crown Court, Innospec and the SFO have agreed to recommend that Crown Court accept a payment plan over time, including both fixed and contingent payments, very similar to the proposal the Department is recommending to this Court. The total fine that will be recommended to the Crown Court is $12.7 million, $7.7 million of which will be in fixed payments and $5 million of which will be contingent payments. Some portion of that amount will be in the form of a contribution to the United Kingdom Development Fund for Iraq.

16

**D.     Agreed Fine - $14,100,000**

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Department and Innospec agree that the appropriate criminal fine in this case is $14,100,000, after consideration of (a) the Sentencing Guidelines, (b) Innospec's anticipated payments of fines, penalties, and disgorgement in related proceedings both in the U.S. and the U.K., (c) its cooperation with the investigations, (d) its compliance and remediation efforts, (e) its inability to pay a substantial fine, and (f) the factors set forth in 18 U.S.C. § 3553(a), is $14,100,000. Although this represents a total fine well below the advisory sentencing guideline range, the Department and Innospec agree and stipulate that "the organization is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay the minimum fine required..." U.S.S.G. § 8C3.3.

Division of the fine and each payment among the four government authorities was based on the following factors, derived from law and policy in both the U.S. and the U.K. as well as relevant international treaties and law: (1) the interests of non-criminal organizations, such as the SEC and OFAC, in civil enforcement actions, including the legislative history of the FCPA and TWEA; (2) the interests of each national jurisdiction in prosecution, including nationality and location of the defendants, the ability of each jurisdiction to prosecute individuals responsible for the misconduct, and the nationality and location of the victims; (3) the portion of the total criminal conduct to which Innospec will plead guilty in each jurisdiction; (4) the investment of investigative resources by each agency; and (5) the ability of the respective agencies to accept contingent payments and an appropriate division of the risk in accepting long-term and contingent payments.

The $14.1 million allocated to the criminal fine in the United States through this process, will be paid as follows:

1.   *Fixed Payments*

| | |
|---|---|
| Within 30 days of settlement: | $3,100,000 |
| By December 31, 2010: | $1,000,000 |
| By December 31, 2011: | $1,000,000 |
| By December 31, 2012: | $875,000 |
| By December 31, 2013: | $1,725,000 |

**TOTAL**                    **$7,700,000**

2.   *Contingent Payments*

By December 31 of each year, from 2010 until 2014, Innospec will pay $2,500 per metric ton of anti-knock compound (including, but not limited to, tetraethyl lead, MMT, and ferrocene) it sold to Iraq in the preceding year, until such time as such payments total $6,400,000, or 2014, whichever occurs first.  The remaining $1,500 per metric ton will be paid toward Innospec's penalties in the United Kingdom.

## V.  COOPERATION AND REMEDIATION

### A.    Cooperation

Under to the Sentencing Guidelines, a company's cooperation should be assessed on the basis of its timeliness and thoroughness:

> To be timely, the cooperation must begin essentially at the same time as the organization is official notified of a criminal investigation.  To be thorough, the cooperation should include the disclosure of all pertinent information known by the organization.  A prime test of whether the organization has disclosed all pertinent information is whether the information is sufficient for law enforcement personnel to identify the nature and extent of the offense and the individual(s) responsible for the criminal conduct.

U.S. Sentencing Guidelines § 8C2.5, commentary note 12.

Innospec's cooperation here was not timely, nor was it initially thorough.[4]  Although Innospec voluntarily agreed to provide the Department with copies of the documents subpoenaed by and produced to SEC, throughout the first fifteen months of the investigation, Innospec's responses to requests from the Department were often extensively delayed without explanation or justification.  In addition, the responses to questions from the Department did not disclose information "sufficient for law enforcement personnel to identify the nature and extent of the offense" during the initial stages of the investigation.  For example, Innospec failed to identify and disclose to the Department that bribe payments continued in Iraq after the end of the OFFP.  The SEC issued two additional subpoenas subsequent to the start of the criminal investigation, after the Department discovered evidence of ongoing, serious criminal conduct.  Most telling, Innospec's criminal conduct continued for more than a year after the Department's criminal investigation commenced.  As a result of Innospec's initial lack of timeliness and thoroughness, the Department is no longer able to prosecute certain individuals it may have been able to prosecute had Innospec's cooperation been more timely, as the statute of limitations has now run as to some of the misconduct at issue.[5]

---

[4]  This analysis relates to the investigation of wire fraud and Foreign Corrupt Practices Act violations.  Innospec voluntarily disclosed its violations of TWEA to OFAC, but made no contemporaneous disclosure to the Department.  Despite this, and the fact that other potential sanctions violations were not identified until the Department's investigation expanded to include potential sanctions violations in Cuba and elsewhere, as well as continued extended delays in the production of documents requested by the investigating agencies related to sanctions violations, the Department considers Innospec to have cooperated in the investigation of the Cuba misconduct.

[5]  In addition, Innospec was advised in 2007 that criminal and civil liability on just OFFP conduct in this matter would exceed $40 million.  Between that time and May 2008, when cooperation improved, Innospec dissipated more than $26 million in assets through dividends and stock buybacks that could have been used to satisfy any obligations or judgments in this case.

Beginning in Spring 2008, Innospec's cooperation vastly improved both in terms of timeliness and thoroughness, although responses to requests from law enforcement continued to be untimely.  Since early 2008, at the Department's request, Innospec has conducted a wide-ranging internal investigation that identified the bribery in Indonesia, not previously known to law enforcement.  In addition, Innospec has consulted closely with the Department as well as other appropriate U.S. government agencies to ensure that critical supplies of TEL to refineries still dependent on its use were not interrupted.

Innospec has cooperated with four government agencies conducting simultaneous investigations in two countries and has incurred in excess of $40 million in professional fees associated with the internal investigation, including the retention of an outside accounting firm.[6]

**B.      Remediation**

Innospec engaged in no actions to remediate its misconduct during the first fifteen months of the investigation and, as noted, its criminal conduct continued into January 2008.  Since that time, Innospec has:

(1)      conducted due diligence on all its third party contracts;

(2)      suspended the agents involved in Iraq and Indonesia misconduct, in one case incurring a lawsuit;

---

[6] Innospec advises that its attorneys and accountants collected 7.5 terabytes of electronic data and thousands of hard copy documents from dozens of employees in multiple offices at locations in the United Kingdom, Europe, and Asia.  Innospec has produced hundreds of thousands of documents as potentially responsive to the requests of both U.S. and U.K. authorities.  In addition, Innospec's attorneys interviewed dozens of employees around the world and voluntarily reviewed with the government the key factual findings from those interviews.

(3)     replaced members of senior management who were involved in, aware of, or who

should have been aware of the criminal conduct, including Innospec's CEO, a

Business Manager, and its General Counsel, and introduced a new management

team; and

(4)     revised its compliance training and made it mandatory for all employees.

For the first fifteen months of the investigation, Innospec also engaged in no enhanced

compliance measures.  Since mid-2008, Innospec has:

(1)     retained an independent accounting firm to design and assist in the

implementation of a new compliance program which includes significant reforms

to Innospec's dealings with agents, distributors and other third parties, and

enhancement of its employee training programs;

(2)     added to its staff a U.S.-trained and based attorney to serve as its new General

Counsel and Chief Compliance Officer, reporting directly to the Board of

Directors' Nominating and Governance Committee; and

(3)     hired a new CEO, based in the United States, and a board member that is a U.S.

attorney.

**C.      Need for an Independent Compliance Monitor**

While the Department acknowledges Innospec's cooperation and remediation, the

extended delays in implementing remediation and enhanced compliance procedures raise

concerns about the depth and breadth of Innospec's commitment to compliance.  The U.S.

Sentencing Guidelines state:

To assess the efficacy of a compliance and ethics program submitted by the
organization, the court may employ appropriate experts who shall be afforded

21

> access to all material possessed by the organization that is necessary for a
> comprehensive assessment of the proposed program.... Periodic reports submitted
> in accordance with subsection (c)(3) should be provided to any governmental
> regulatory body that oversees conduct of the organization relating to the instant
> offense.

U.S. Sentencing Guidelines § 8D1.4, Commentary note 1. Given the nature and seriousness of

the misconduct, which involved the corruption of officials at high levels in two governments and

the use of funds designated for humanitarian relief for the payment of kickbacks to a state

sponsor of terrorism; the pervasiveness and duration of the conduct, including the involvement of

senior executives of the company; the late implementation of compliance and remedial measures;

and the lack of a culture of compliance in the company; the Department believes that an

independent compliance monitor is necessary and has required the appointment of such a monitor

as a condition of the plea agreement. The SEC and the SFO are also requiring a monitor, and the

three agencies have agreed to consult on selection of a single monitor that report to each agency.

Because the proposed fine schedule includes contingent payments, the Department has

required, as a condition of the plea agreement, that the monitor be in place at least until the

contingent payments are completed.[7] Once those payments are complete, the plea agreement

---

[7] The U.S. Sentencing Guidelines recommend that, where an organization is sentenced to
pay a monetary penalty and such penalty is not paid in full at the time of sentencing and
restrictions are necessary to safeguard the organization's ability to make payments, the court shall
order a term of probation. U.S.S.G. § 8D1.1(a)(2). The Guidelines further provide that where
such probation is ordered, conditions should be imposed where necessary and appropriate to
safeguard the organization's ability to pay any deferred portion of the fine, including regular
reports to the court and submission of the organization to unannounced examinations of its books
and records and interrogation of knowledgeable individuals with the organization by experts
appointed by the court. U.S.S.G. § 8D1.4(b). The Department believes that, in this case, an
independent compliance monitor can take the place of such conditions.

provides that the monitorship may be terminated early if all requirements are fulfilled, or extended if they are not.

## VI. CONCLUSION

For the foregoing reasons, the Department respectfully recommends that the Court accept Innospec's guilty plea to the Information and sentence Innospec to a fine in the amount of $14,100,000, to be paid over five years on both a fixed and a contingent basis, and a special assessment of $2,800.  In addition, the Department recommends that Innospec receive organizational probation until payment of the fine is complete and that, as a condition of that probation, it be required to have an independent corporate compliance monitor, reporting annually to the Department, for a minimum of three years and continuing until all contingent payments are made and terms of the monitorship are fulfilled, or probation expires, whichever occurs first.

DENIS J. MCINERNEY
Chief
Fraud Section, Criminal Division

By:

Kathleen M Hamann
Trial Attorney
Fraud Section, Criminal Division
(202) 305-7413

United States Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005

Date: March 5, 2010